1

HONORABLE RICHARD A. JONES

2

3

4

5

6

7

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

8

HYDRA-PRO DUTCH HARBOR, INC.,

9

Plaintiff,

10

CASE NO. C08-1695RAJ

v.

11

ORDER

SCANMAR, AS, et al.,

12

Defendants.

13

14

## I.  INTRODUCTION

15

There are two motions pending in this action: Defendant Scanmar, AS,

16

("Scanmar") has moved (Dkt. # 83) for summary judgment on the claims of Plaintiff

17

Hydra-Pro Dutch Harbor, Inc. ("HPDH"); HPDH in turn has moved (Dkt. # 89) for

18

summary judgment on all of Scanmar's counterclaims.  For the reasons stated below, the

19

court TERMINATES both motions, subject to the rulings made herein, and reserves a

20

final ruling pending the outcome of Scanmar's suit to confirm the arbitration award it

21

obtained against an entity closely related to HPDH, Hydra-Pro Seattle, Inc. ("HPSEA").

22

The court also GRANTS HPDH's motion (Dkt. # 106) to file a supplemental brief one

23

day late.  This action will remain STAYED pending further order of the court.

24

## II.  BACKGROUND

25

As the court has observed in previous orders, HPSEA and HPDH are closely

26

related companies in the business of selling, maintaining, and repairing commercial

27

fishing equipment in the Pacific Northwest.  HPDH and HPSEA have the same president,

28

ORDER – 1

Ed Ramberg, and the evidence demonstrates amply that HPDH's other owner, Tim Tilleman, was heavily involved in HPSEA's business.

Until the end of 2007, HPSEA had a written distributorship agreement with Scanmar granting it exclusive rights to sell and service Scanmar equipment in Washington, California, Oregon, and Alaska. Scanmar formally terminated that agreement in December 2007, at least in part because it contended that HPSEA had not paid numerous long-outstanding invoices.

When Scanmar terminated the agreement, either HPSEA or HPDH had issued 12 or 13 purchase orders for equipment for fishing vessels in the Dutch Harbor fleet. Scanmar declined to honor those orders, and instead made independent efforts to complete the sales reflected therein. It appears that it was successful in part.

The written distributorship agreement contained a clause mandating arbitration of disputes in Norway, Scanmar's home country. Scanmar invoked the clause to resolve numerous disputes that arose between it and HPSEA before and after the termination of the distributorship agreement.

HPDH brought this action even before Scanmar sought arbitration in Norway. HPDH's complaint alleges that Scanmar breached an oral distributorship contract with it by refusing to honor the purchase orders pending in December 2007. It also alleges that Scanmar tortuously interfered with its business expectancies by selling directly to customers who had made the orders, and by robbing it of future sales of Scanmar products in the region.[1] It also contends that Scanmar unjustly enriched itself by profiting from HPDH's marketing efforts. Scanmar counterclaimed, contending that HPDH attempted to interfere with its lawful efforts to secure purchase orders after the termination of the distributorship agreement. It also contended that the same conduct breached HPDH's duty of good faith and fair dealing.

---

[1] HPDH contends that the oral distributorship agreement it had with Scanmar should have expired on the same day HPSEA's written distributorship agreement expired: November 11, 2008. HPDH's Opp'n (Dkt. # 91) at 13.

ORDER – 2

HPDH later reversed course, asking this court to stay this action while it attempted to intervene in the arbitration between Scanmar and HPSEA. After some wrangling between the parties, which the court has described in previous orders, the parties agreed to stay this litigation, but reserved the right to file cross-motions for summary judgment. Dkt. # 87.

By the time the court reviewed the cross-motions, the arbitrator had denied HPDH's motion to intervene. In a March 25, 2010 order ("March Order"), the arbitrator made clear that he found little difference between the actions of HPDH and HPSEA with respect to the dispute before him. He observed that Mr. Ramberg was the sole owner of HPSEA and at 68% owner of HPDH. March Order at 2, 3. He found that the "loss items which are invoked from HP Dutch are the same as are invoked by HP Seattle . . . ." *Id.* at 3. He noted that HPSEA had "deliberately and willfully manoeuvred [sic] to bring HP Dutch into such a role where they seek to define that company as the Distributor." *Id.* at 4. He made several findings suggesting that he found no merit in HPDH's claim to have entered an oral distributorship agreement. *Id.* at 4, 7-9. Like this court, he agreed that it would be "clearly advantageous" to resolve HPDH's claims and HPSEA's claims in the same proceeding. *Id.* at 7. He declined to permit HPDH to intervene, however, because he found that whatever agreement might have existed between Scanmar and HPSEA, they did not agree to arbitrate their disputes. *Id.* at 9 ("After a comprehensive appraisal the Court has found there to be insufficient evidence that there exists an agreement for arbitration between the Plaintiff and HP Dutch.").

The court's review of the March Order convinced it that the arbitrator's final decision, which was expected in July, would have a significant impact on the claims in this litigation. July 1 Order (Dkt. # 103) at 4. The court thus declined to resolve the parties' summary judgment motions pending that ruling. It also ordered the parties to provide supplemental briefing on the preclusive effect of the final ruling once the arbitrator issued it.

ORDER – 3

On July 8, the arbitrator issued a decision ("Final Award") that favored Scanmar on the majority of the parties' disputes.  The arbitrator's exhaustive order left little doubt about what issues the parties raised and what issues it resolved.  Mr. Ramberg and his Chief Financial Officer presented HPSEA's case.  Mr. Tilleman testified by telephone. Final Award at 4-5.  Scanmar contended that HPSEA owed it for the loss of sales reflected in the 12 or 13 pending purchase orders (*id.* at 12); HPSEA contended that Scanmar owed it for the same lost sales, whether the purchase orders were reflected HPSEA's sales or HPDH's sales (*id.* at 19-20).  Scanmar sought damages for lost sales in 2008 arising from its need to find a new distributor in the region (*id.* at 13); HPSEA sought damages both on its own behalf and on HPDH's behalf for lost sales as a result of the wrongful termination of the distributor agreement (*id.* at 19-20).

The arbitrator concluded that Scanmar was justified in terminating its distributorship with HPSEA.  *Id.* at 27.  He also concluded that Scanmar was entitled to the benefit of the 12 or 13 pending purchase orders that were pending at termination.  *Id.* at 28-31.  He ruled that Scanmar was able to independently secure many of those sales after the termination, but ordered HPSEA to compensate Scanmar for those sales Scanmar could not complete.  *Id.* at 31.  It also ruled that HPSEA owed Scanmar compensation for lost sales resulting from its lack of representation in the distributorship region in the early part of 2008.  *Id.* at 32-33.

In light of the arbitrator's ruling, the court now turns to the parties' dispositive motions.  Scanmar seeks dismissal of all of HPDH's claims; HPDH seeks dismissal of all of Scanmar's counterclaims.

### III.  ANALYSIS

Since HPDH announced its intent to intervene in the arbitration, the court has been concerned that the parties are effectively litigating the same dispute in two forums.  The parties have flip-flopped on this issue, suggesting that their position on their dual-forum attack depends largely on whether they stand to benefit from it.  Scanmar initially

ORDER – 4

opposed any suggestion that the two disputes were related, while HPDH claimed that they were so related that the court should stay this case.  Now, HPDH contends that the arbitrator's ruling has no impact on this case, whereas Scanmar contends that the arbitrator's ruling is somehow fatal to all of HPDH's claims, but not to Scanmar's counterclaims.

The doctrines of claim preclusion and issue preclusion (or *res judicata* and collateral estoppel, as they are also known) govern the court's determination of the legal effect of the arbitration.  For purposes of this order, the court focuses on issue preclusion.  As the court will discuss in detail, different jurisdictions have different requirements for issue preclusion.  In general, however, courts impose the following requirements:

> (1) the issue at stake must be identical to the one alleged in the prior litigation; (2) the issue must have been actually litigated in the prior litigation; and (3) the determination of the issue in the prior litigation must have been a critical and necessary part of the judgment in the earlier action.

*Clark v. Bear Stearns & Co.*, 966 F.2d 1318, 1320 (9th Cir. 1992).  Arbitration can serve as "prior litigation" that has a preclusive effect on a later court proceeding.  *Id.* at 1321.

The devil is in the details, however, and in this case, the parties have overlooked details that are critical to the court's application of issue preclusion.  First, in a case like this one in which the court's jurisdiction is founded on diversity of citizenship, the court applies the preclusion law of the forum state.  *Jacobs v. CBS Broad., Inc.*, 291 F.3d 1173, 1177 (9th Cir. 2002).[2]  Washington courts require affirmative answers to four questions to apply issue preclusion:

---

[2] A federal court's choice of preclusion law depends both on whether it exercises diversity jurisdiction and from what court the prior judgment issued.  *See, e.g.*, *Marshall v. Stern (In re Marshall)*, 600 F.3d 1037, 1061 (9th Cir. 2010) (applying state law to determine preclusive effect of a judgment from that state's courts); *Taco Bell Corp. v. TBWA Chiat/Day Inc.*, 552 F.3d 1137, 1144 (9th Cir. 2009) (applying state law to determine preclusive effect of a federal court's judgment where federal court exercised diversity jurisdiction); *Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Planning Agency*, 322 F.3d 1064, 1077 n.10 (9th Cir. 2003) (applying federal law to determine preclusive effect of federal court judgment).

ORDER – 5

(1) Was the issue decided in the prior adjudication identical with the one presented in the action in question?  (2) Was there a final judgment on the merits?  (3) Was the party against whom the plea is asserted a party or in privity with a party to the prior adjudication?  And (4) will the application of the doctrine not work an injustice on the party against whom the doctrine is to be applied?

*Larsen v. Farmers Ins. Co.*, 909 P.2d 935, 937 (Wash. Ct. App. 1996).  When answering the second question, Washington courts look to the law of the state that rendered the first decision to determine whether it is a final judgment on the merits.  *Id.*  When the first decision comes from an arbitration in another state, a Washington court similarly looks to the law of that state with respect to the finality of arbitration awards.  *Id.*  In *Larsen*, for example, the court declined to afford preclusive effect to an Oregon arbitration award where Oregon law required such awards to be confirmed in a state court to make them final.  *Id.* at 940.

It thus appears to the court that Norwegian law governs the preclusive effect of the Norwegian arbitrator's rulings.  Neither party has addressed this issue, and thus neither party has addressed the finality of arbitration awards under Norwegian law.  HPDH contends that the court should apply Alaska preclusion law, but it ignores *Jacobs*, which dictates that HPDH's choice of a Washington forum for this action mandates the application of Washington preclusion law.[3]  Scanmar acknowledges Washington preclusion law, except for its command that a court consider the law of the state of rendition to determine the finality of an arbitration award.

The parties have also not acknowledged another development that likely affects the finality of the arbitration award.  Scanmar has now filed a separate action in this court to confirm the arbitrator's award.  Case No. C10-1198RAJ (invoking 9 U.S.C. §§ 201-208, which implements the Convention on the Recognition and Enforcement of Foreign Arbitral Awards of June 10, 1958).  HPSEA has filed a motion to dismiss that action,

---

[3] HPDH's choice of a forum in Seattle, where HPSEA is headquartered, is additional evidence of a close relationship between the two entities.

ORDER – 6

contending that the arbitrator's award cannot be confirmed.  Scanmar has yet to oppose that motion or file a motion for affirmative relief.  For now, it suffices to observe that the finality of the arbitrator's award is an open question, and therefore so is its preclusive effect.

The court will therefore stay this action pending the outcome of Scanmar's action to confirm the arbitral award.  The court does so because it finds it likely that in the event the award is (or becomes) a judgment that can serve as the basis for issue preclusion, the award disposes of this action in its entirety.[4]  To explain that conclusion, the court uses the remainder of this order to apply the other issue preclusion requirements of Washington law.  The court will permit the parties to address that analysis in the event that Scanmar succeeds in confirming the arbitral award.

But for the unresolved questions regarding the finality of the arbitrator's award, the application of issue preclusion in this case is straightforward.  As the court will now discuss, the issues decided in the prior adjudication are identical to issues that are dispositive of this action, HPSEA and HPDH are in privity for purposes of applying issue preclusion, and giving the arbitration award preclusive effect would not work injustice against any party.

### A.    Identity of Issues

For each of the parties' claims and counterclaims, there is at least one dispositive issue that the arbitrator has already resolved.

With respect to HPDH's breach of contract claim, the arbitrator did not determine whether the oral distributorship alleged in HPDH's complaint existed.[5]  His rulings are

---

[4] Scanmar has reserved the right to claim attorney fees arising from its defense against a RICO claim that HPDH voluntarily dismissed with prejudice.

[5] The court noted in its July 1, 2010 order that the arbitrator seemed skeptical at best about HPDH's claim to an oral distributorship contract when it denied HPDH's motion to intervene. Dkt. # 103 at 4.  The basis of the arbitrator's ruling, however, was narrower.  He merely found that even if HPDH and Scanmar reached an agreement, that agreement did not include an agreement to arbitrate.

ORDER – 7

dispositive, however, as to the damages HPDH claims for breach of contract.  The only contract damage claims HPDH has advanced arise out of the 12 or 13 purchase orders pending in December 2007 and future sales that would have arisen from the distributorship.  As to the purchase orders, the arbitrator determined that HPSEA owed Scanmar damages for sales reflected in those purchase orders to the extent Scanmar was unable to secure those sales after termination of the written distributorship agreement. Implicit in that ruling is a ruling that the purchase orders are attributable to HPSEA, not HPDH.  As to future sales, the arbitrator ruled that HPSEA was liable for sales Scanmar lost in the distributorship region in 2008 due to Scanmar's temporary loss of a distributor in the area.  Implicit in that ruling is a rejection of the notion that HPDH could be entitled to damages arising from those sales, or any sales thereafter.  The arbitrator's ruling is thus dispositive of HPDH's contract claim, because it is dispositive of HPDH's contract damages.

As to HPDH's tortious interference claim, the arbitrator ruled that any expectancy in the 12 or 13 purchase orders was HPSEA's, and thus not HPDH's.  HPDH therefore has no tortious interference claim to the extent it contends that the purchase orders were its valid business expectancy.  Moreover, the arbitrator ruled that Scanmar's efforts to secure the sales reflected in the purchase orders were lawful (and provided a basis to reduce the damages awarded against HPSEA), another ruling that precludes a tortious interference claim based on the purchase orders.  To the extent the claim is based on interference with a business expectancy arising after the 13 purchase orders, HPDH has pointed to no valid business expectancy with which Scanmar could have interfered.  The arbitrator ruled that Scanmar had the right to sell its products in the region after the termination of its distributorship agreement with HPSEA.

HPDH's unjust enrichment claim fails for the same reasons.  First, the arbitrator's ruling that the purchase orders were HPSEA's means that if Scanmar was unjustly enriched at all, it was enriched at HPSEA's expense.  Second, the arbitrator considered

ORDER – 8

1  the extent to which Scanmar was able to secure the sales reflected in the purchase orders
2  after the termination of the distributorship agreement.  It offset the damage award against
3  HPSEA accordingly.  Given the arbitrator's careful consideration of the marketing
4  activity of HPSEA and HPDH representatives, the court finds that any unjust enrichment
5  is reflected as an offset to that damage award.

6      The court now turns to Scanmar's counterclaims for tortious interference and
7  breach of a duty of good faith and fair dealing.  The tortious interference claim fails
8  because the arbitrator already awarded Scanmar any damages it could obtain on this
9  claim.  It awarded Scanmar damages for any lost sales from the purchase orders, as well
10 as lost future sales in 2008 before Scanmar was able to install a new agent in the region.
11 Scanmar points to no other damages to which it could be entitled for tortious interference.
12 The same is true of its claim for a breach of HPDH's duty of good faith and fair dealing.

13      **B.  HPSEA and HPDH Are In Privity.**

14      When HPSEA presented its claims and defenses in arbitration, it contended that
15 the very purchase orders that HPDH claims were either its own purchase orders, or orders
16 for which it would have compensated HPDH.  The arbitrator disposed of those
17 arguments.  Nonetheless, that HPSEA presented those claims at all is powerful evidence
18 that it was HPDH's privy.  HPDH cannot complain that HPSEA did not adequately
19 represent its interests.  HPDH's president and majority owner, Ed Ramberg, presented
20 HPSEA's case to the arbitrator.  HPSEA sought to recover not only its own claims, but
21 claims for which it contended HPDH would seek indemnity from it.  There is no
22 indication that it did not act in HPDH's interests.

23      **C.  There is No Injustice in Applying Issue Preclusion Against HPDH.**

24      It was HPDH who first contended that this action should await the disposition of
25 the arbitration.  HPDH hoped to intervene as a separate party.  Although that effort failed,
26 there is every indication that HPSEA presented the very claims and defenses that HPDH
27 would have presented.  The arbitrator's extensive discussion of HPSEA's claims shows
28 ORDER – 9

that HPSEA already presented these claims.  There is no injustice in denying HPDH a second bite at the proverbial apple.

The court makes no ruling on whether the arbitration itself was conducted fairly. That issue is the subject of Scanmar's suit to confirm the arbitration award.  As noted above, the resolution of the claims in this case will await the outcome of that action.

## IV.  CONCLUSION

For the reasons stated above, the court directs the clerk to TERMINATE the parties' pending motions (Dkt. ## 83, 89).  The court GRANTS HPDH's motion (Dkt. # 106) to file its supplemental brief one day late.  This action will remain stayed pending the outcome of Scanmar's action to confirm the arbitration award.  If that action results in the confirmation of the arbitration award, the court will permit the parties a final opportunity to address the award's preclusive effect.

DATED this 20th day of September, 2010.

The Honorable Richard A. Jones
United States District Judge

ORDER – 10