HONORABLE RICHARD A. JONES

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

HYDRA-PRO DUTCH HARBOR, INC.,

    Plaintiff and Counterclaim Defendant,

    v.

SCANMAR, AS,

    Defendant and Counterclaim Plaintiff.

CASE NO. C08-1695RAJ

ORDER

## I. INTRODUCTION

This matter comes before the court on the parties' cross-motions for summary judgment. No one requested oral argument, and the court finds oral argument unnecessary. For the reasons stated herein, the court GRANTS the motion (Dkt. # 140) of Counterclaim Defendant Hydra-Pro Dutch Harbor, Inc. ("HPDH") and DENIES the motion of Counterclaim Plaintiff Scanmar, AS (Dkt. # 137). The clerk shall enter judgment for HPDH on Scanmar's two counterclaims, which are the only claims remaining in this action.

## II. BACKGROUND

**A.  Summary of Dispute and Litigation Between Scanmar and the Hydra-Pro Entities**

Today the court considers for the final time the demise of a business relationship between Scanmar and two related companies: HPDH and Hydra-Pro, Inc. The latter

ORDER – 1

entity, which the court will call "HPSEA," is a Seattle-based company selling equipment to commercial fishing vessels. HPDH, based in Dutch Harbor, served as an Alaska-based hub for servicing the equipment while the vessels fished in Alaskan waters. The two companies shared the same President, Ed Ramberg, had overlapping ownership, and worked closely together. They are legally distinct entities, however, an undisputed point that all parties have struggled mightily to use to their advantage throughout this dispute.

From 2004 to 2007, Scanmar and HPSEA had a written distribution agreement. Scanmar manufactured fishing equipment in Norway; HPSEA sold that equipment to customers in the Pacific Northwest. HPSEA was to be Scanmar's exclusive distributor in the covered territory. To execute sales of Scanmar products, HPSEA issued purchase orders in its own name to Scanmar, Scanmar shipped the products to HPSEA, and HPSEA installed those products aboard the vessels of its customers. Of course, part of the arrangement was that HPSEA would pay Scanmar for the products that it ordered. By 2007, it was this essential obligation that was creating friction between the parties.

Toward the end of 2007, HPSEA's failure to pay led Scanmar to refuse to honor a few purchase orders. The court will soon examine that act in detail, but for now it suffices to note that HPSEA and Scanmar were in a difficult position. Scanmar was reluctant to continue shipping product to a company that was not paying, and HPSEA needed to continue to sell Scanmar products if it hoped to remedy its financial woes. Part of HPSEA's strategy was to attempt to introduce HPDH as a new distributor of Scanmar products, one that could sell Scanmar's products much as HPSEA had, but without the burden of HPSEA's debt. Again, the court will soon examine HPDH's attempts to work with Scanmar in detail, but it suffices for now to note that HPDH and Scanmar never came to an agreement. That was unfortunate for everyone, because much of the parties' mutual business consisted of sales to fishing enterprises in advance of a fishing season that began early in the calendar year. Because the parties were unable to reach an agreement, sales that they could have made at the end of 2007 were put in jeopardy.

ORDER – 2

Ultimately, the court will not need to consider to what extent Scanmar lost business as a result of its messy breakup with the Hydra-Pro entities. That is in large part because HPSEA and Scanmar brought their disputes to a Norwegian arbitration in accordance with their distribution agreement. That resulted in a July 2010 decision that largely favored Scanmar. Before the arbitrator decided the dispute between HPSEA and Scanmar, however, it rejected HPDH's attempt to intervene in the arbitration. The arbitrator found, unsurprisingly, that HPDH and Scanmar had no arbitration agreement because they had no ongoing agreement at all. HPDH had issued some purchase orders to Scanmar, which Scanmar had filled, but that was the result of an order-by-order series of decisions by Scanmar to accept the orders (which technically violated the exclusive distribution agreement with HPSEA) and HPSEA's willingness to permit its sibling company to place some orders where doing so advanced their mutual business interests.

Before the arbitration, HPDH filed this lawsuit. It contended, among other things, that Scanmar's refusal to honor its attempts to place purchase orders in late 2007 violated the law in various ways. Scanmar counterclaimed, alleging that HPDH's conduct with respect to those same orders constituted both tortious interference with a contract or business expectancy and a breach of the implied covenant of good faith and fair dealing. The court stayed this action pending the outcome of the arbitration, believing that the outcome of the arbitration was likely to have a substantial impact on the outcome of that suit. The court placed too much stock in that belief. It treated HPDH as essentially an extension of HPSEA, and ruled that the preclusive effect of the arbitration award meant that Scanmar must largely prevail in this action, just as it had largely prevailed in the arbitration. The court ultimately entered judgment dismissing HPDH's claims and entering judgment in Scanmar's favor on its two counterclaims.

HPDH appealed the judgment, solely as to Scanmar's counterclaims, and succeeded. The Ninth Circuit Court of Appeals ruled in that the court had erred in holding that the arbitration had a preclusive effect on Scanmar's counterclaims. It

ORDER – 3

reversed and remanded. The parties requested leave to file yet another round of dispositive motions, which the court granted.

Despite the Ninth Circuit's opinion, both parties persist in attempting to use the arbitration decision to their advantage. They attempt to invoke collateral estoppel, judicial estoppel, and more. The court will address none of those arguments, because it can resolve the counterclaims without reference to the arbitration. Scanmar's counterclaims against HPDH fail because HPDH owed no duty to Scanmar. The "misconduct" to which Scanmar points in late 2007 consisted of nothing more than HPDH's attempts to convince Scanmar to do business with it. Although those attempts failed, they were not unlawful. To explain that conclusion, the court examines the parties' late 2007 and early 2008 interactions in detail.

**B.    Interactions Between Scanmar and the Hydra-Pro Entities in Late 2007 and Early 2008**

By 2007, the distribution agreement was disintegrating. HPSEA owed a substantial debt to Scanmar for unpaid purchase orders. HPSEA forwarded four purchase orders to Scanmar in late October; Scanmar refused to honor any of them in light of HPSEA's debt. Congalton Decl. (Dkt. # 139), Ex. 4. In an October 31 email rejecting the purchase orders, Scanmar stated that it would "try to make delivery and invoicing directly to [the] customer to avoid delay in delivery and fishing." *Id.* Nothing in the letter suggested that HPSEA was creating any impediment to Scanmar dealing directly with the customers.

At about the same time, HPSEA explored using HPDH as a Scanmar distributor while it attempted to pay its debts to Scanmar. Tim Tilleman, HPDH's co-owner and manager, discussed that possibility with a Scanmar representative at a convention in Denmark in October 2007. Scanmar stated that it would not honor orders from HPDH until HPSEA settled its debt. Skjold-Larsen Decl. (Dkt. # 138), ¶ 4. Mr. Tilleman disputes that assertion. Tilleman Decl. (Dkt. # 92) ¶8 ("Henning told me that Scanmar

ORDER – 4

would sell me all the items in the sales I secured and was anticipating to secure from my customers . . . ."); *see also* Tilleman Decl. (Dkt. # 92), Ex. 5 (Nov. 7 email from Knut Halvorsen to Mr. Tilleman, inquiring about "orders we agreed upon in Denmark . . . .").

Mr. Ramberg emailed Scanmar on November 6, 2007. He acknowledged Scanmar's desire to sell equipment directly to HPSEA's customers, and inquired whether HPSEA would still receive its commission on those sales. Congalton Decl. (Dkt. # 139), Ex. 5. He also stated that Mr. Tilleman was "very upset and does not want to continue investing more time and money servicing the Scanmar equipment unless Hydra-Pro (Seattle and Dutch Harbor) can continue to sell and service as in the past." *Id.* He explained that because the fishing fleet to which HPSEA sold was "currently fishing out of Dutch Harbor year around," he could not "see how to carry on representing [Scanmar] unless we have [HPDH] and Tim onboard as a partner." *Id.* He stated that "[u]nless we can work this out quickly, we see no other alternatives [but] to terminate the agreement with Scanmar." *Id.* He proposed that HPDH "should also be set up as a dealer allowing them to purchase directly from you?" *Id.*

In a response it sent the same day, Scanmar did not specifically address whether it would treat HPDH as a distributor. Congalton Decl. (Dkt. # 139), Ex. 5. It did, however, state that it had "reached an agreement with [Mr. Tilleman] that the order list he had, if confirmed orders, will be sold to the customer [at] old prices, if we have them this week. We also agreed that the 20% increase, due to change in exchange rates, should be split between us and [Mr. Tilleman]." *Id.*

Mr. Ramberg wrote back the same day, acknowledging HPSEA's debt and his intent to pay it, but complaining about Scanmar's plan to commence collection proceedings. Congalton Decl. (Dkt. # 139), Ex. 6. He stated that "[i]f [collection] is the route you choose to take, please consider this the termination of our agreement." *Id.* He told Scanmar that HPSEA could not "work shoulder to shoulder with [Scanmar] at [an upcoming] Fish Expo under these circumstances." *Id.*

ORDER – 5

Scanmar responded on November 8, reiterating that it would not sell to product to HPSEA unless it repaid its debt. Congalton Decl. (Dkt. # 139), Ex. 6. It also explained that "if we have to take direct orders, you will not be entitled to any commission." *Id.*

Also on November 8, Mr. Tilleman wrote to Scanmar explaining that he was trying "to get some orders together" and needed prices for certain products. Tilleman Decl. (Dkt. # 92), Ex. 5. A Scanmar representative provided price quotes the same day, and did not suggest that Scanmar had any quarrel with Mr. Tilleman making new orders. *Id.* Mr. Tilleman and the same representative exchanged similar emails on November 30. *Id.* Again, Mr. Tilleman asked for price information on orders he was placing, and again the Scanmar representative provided the prices without suggesting that it would not honor the orders. *Id.*

Between October 31 (the date Scanmar rejected the four purchase orders from HPSEA) and December 17, there is no evidence that Scanmar took any steps to contact HPSEA or HPDH customers directly. There is no evidence that Scanmar directly contacted any customer, and no evidence that Scanmar asked for information from HPDH or HPSEA that would help it contact any customer. There is no evidence, moreover, that Scanmar requested that HPDH or HPSEA do anything about either the four purchase orders Scanmar had rejected or the unspecified new orders that Mr. Tilleman was preparing.

Between December 9 and December 21, Mr. Tilleman forwarded 13 purchase orders to Scanmar. Aprans Decl. (Dkt. # 90), Ex. 2 (Tilleman Depo. at 97-100); Tilleman Decl. (Dkt. # 92) ¶ 10. When Mr. Tilleman forwarded the first eight of the orders, he intentionally omitted the names of the vessels for which he had placed the orders, because he did not want Scanmar to directly contact the customers who had placed the orders. Tilleman Decl. (Dkt. # 92) ¶ 10. Scanmar wrote on December 17 to request "boat names, boat-code and channels" for the purchase orders. *Id.*, Ex. 6. Mr. Ramberg provided that information by December 20. *Id.* ¶ 11.

ORDER – 6

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21

Mr. Tilleman's December 2007 purchase orders were emblematic of a new approach HPSEA and HPDH had devised to get around Scanmar's refusal to sell to HPSEA. On December 20, Mr. Ramberg wrote to Scanmar explaining that both HPSEA and HPDH had "been purchasing parts and sensors from Scanmar for some time." Congalton Decl. (Dkt. # 139), Ex. 8. He admitted that HPDH did "not have a formal distributor agreement with Scanmar," but stated that Scanmar had been treating HPDH as a distributor "with parts and sensor sales for quite some time." *Id.* Separately, he wrote Mr. Tilleman on December 20, instructing him to forward 13 purchase orders to Scanmar. Congalton Decl. (Dkt. # 139), Ex. 9. Some of them were identical to the orders Mr. Tilleman had already forwarded earlier in the month, except that they now contained vessel names. The purchase orders, dated from October 24, 2007 to December 9, 2007, all bore HPDH "ship to" addresses. *Id.* Four of those orders were simply re-issues of the HPSEA purchase orders that Scanmar had refused to honor in late October. Congalton Decl. (Dkt. # 139), Ex. 17 (Ramberg Depo. at 72-74); *id.* Ex. 13 (requests for admission confirming that October 24 and October 25 purchase orders were the four that HPSEA had originally submitted in late October); Aprans Decl. (Dkt. # 90), Ex. 2 (Tilleman Depo. at 97-100) (reviewing 13 purchase orders). Mr. Ramberg told Mr. Tilleman that "[o]ur argument is that you are a dealer. Scanmar has always been treating you as a dealer. You have received dealer discount, participated in dealer conferences, shows. HPDH has been on . . . Scanmar's website as an authorized dealer etc." Congalton Decl. (Dkt. # 139), Ex. 9.

22
23
24
25
26
27

The next day, Scanmar wrote Mr. Ramberg and stated that until HPSEA had paid its debt, Scanmar would make "no delivery [of orders] through any of your companies." Congalton Decl. (Dkt. # 139), Ex. 8 (Dec. 21, 2007 email). Scanmar also stated that to "avoid customers from suffering or caus[ing] any possible delays in the deliveries, Scanmar will contact the end customers directly." *Id.* The same day, another Scanmar representative wrote Mr. Ramberg and stated that Scanmar "found it absolutely necessary

28  ORDER – 7

to immediately contact the customers directly to sort out what they need of Scanmar equipment for the upcoming season." *Id.* (Dec. 21 email from Knut Halvorsen).

In response, Mr. Ramberg proposed reissuing "the four (4) Seattle Purchase Order[s] directly to you through [HPDH]." Congalton Decl. (Dkt. # 139), Ex. 8. He did not reject Scanmar's proposal to contact customers directly, but he stated that he "expect[ed] to be compensated" for the efforts of both HPSEA and HPDH in securing those orders. *Id.*

Scanmar rejected HPDH's orders on December 27, citing the exclusivity provision of the distribution agreement with HPSEA. Congalton Decl. (Dkt. # 139), Ex. 8 (Dec. 27 email). It did so even though it wrote HPSEA the same day to terminate the distribution agreement. Congalton Decl. (Dkt. # 139), Ex. 10.

Mr. Tilleman tried without success to convince Scanmar to either accept the purchase orders or pay commission to HPDH in the event that Scanmar completed the sales directly with the customers. *Id.* (Dec. 28 & Dec. 29 emails from Mr. Tilleman).

On December 28, Scanmar wrote at least one email to a customer explaining that "we are not able to honour orders from Hydra-Pro Inc. due to long overdue receivables and lack of payment." Congalton Decl. (Dkt. # 139), Ex. 19 (Ex. Z to Tilleman deposition). It requested that the customer "Please place orders directly to us; Scanmar@scanmar.no." *Id.* Mr. Tilleman wrote to at least one of the customers who Scanmar had written to request that the customer "email Scanmar and tell them that you would prefer to buy their product through their dealer [HPDH]." Congalton Decl. (Dkt. # 139), Ex. 19 (Ex. A to Tilleman deposition). The email explained that HPDH depended on the commissions from its orders to Scanmar to be able to continue to support its customers. *Id.* Scanmar issued a follow-up email to an unspecified number of customers on January 4, 2008, and then another follow-up email to 11 recipients on February 11. Tilleman Decl. (Dkt. # 92), Ex. 8.

ORDER – 8

For reasons the court will later discuss, it is not necessary to dwell on the results of the end of Scanmar's relationship with HPDH and HPSEA. At least one major customer placed an order with Scanmar, then returned it, then stopped purchasing from Scanmar. That customer cited uncertainty over the ability to service Scanmar parts if HPDH was no longer authorized to do so. Marchesano Decl. (Dkt. # 141), Ex. 3 (Gunsolus Depo. at 26-28); Congalton Decl. (Dkt. # 139), Ex. 1 (Gunsolus Depo. at 37-39). Scanmar was able to sell directly to some other customers. Marchesano Decl. (Dkt. # 141), Ex. 2 (emails evidencing sales to Ocean Peace, Inc. in early 2008).

According to Scanmar, HPDH is liable for the business Scanmar lost in the wake of the parties' messy separation. Specifically, it contends that HPDH is liable for tortious interference with a contract or business expectancy, and that HPDH breached the implied covenant of good faith and fair dealing. Scanmar has moved for partial summary judgment, requesting only that the court declare HPDH liable, with damages to be determined at trial. HPDH has moved for summary judgment against both counterclaims.

### III.  ANALYSIS

On a motion for summary judgment, the court must draw all inferences from the admissible evidence in the light most favorable to the non-moving party. *Addisu v. Fred Meyer, Inc.*, 198 F.3d 1130, 1134 (9th Cir. 2000). Summary judgment is appropriate where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The moving party must initially show the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The opposing party must then show a genuine issue of fact for trial. *Matsushita Elect. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The opposing party must present probative evidence to support its claim or defense. *Intel Corp. v. Hartford Accident & Indem. Co.*, 952 F.2d 1551, 1558 (9th Cir. 1991). The court defers to neither party in resolving purely legal questions. *See Bendixen v. Standard Ins. Co.*, 185 F.3d 939, 942 (9th Cir. 1999).

ORDER – 9

**A.     Tortious Interference**

Washington law[1] requires a party claiming tortious interference to prove five elements:

> (1) the existence of a valid contractual relationship or business expectancy; (2) that defendants had knowledge of that relationship; (3) an intentional interference inducing or causing a breach or termination of the relationship or expectancy; (4) that defendants interfered for an improper purpose or used improper means; and (5) resultant damage.

*Leingang v. Pierce County Medical Bureau*, 930 P.2d 288, 300 (Wash. 1997).

Scanmar contends that HPDH interfered in three ways. It claims that prior to Scanmar's termination of its distribution agreement with HPSEA, HPDH interfered with that agreement. During the same period, it claims that HPDH interfered with its expectancies in the purchase orders by delaying their processing. Once Scanmar had terminated its agreement with HPSEA, it contends that HPDH interfered with its business expectancies by sending the email to its customers requesting that they purchase Scanmar equipment only through HPDH. None of these claims withstands scrutiny.

**1.     HPDH Did Not Interfere with Scanmar's Distribution Agreement with HPSEA.**

Scanmar cannot allege, much less provide evidence for, a claim that HPDH interfered with its distribution agreement with HPSEA. The court accepts, purely for purposes of this motion, that HPSEA's debt gave Scanmar the right to deal directly with HPSEA's customers.[2] Nothing obligated HPDH to assist Scanmar in the process of dealing directly with those customers. Both when it resisted HPDH's effort to intervene

---

[1] HPDH conducted its business in Alaska; Scanmar conducted its business in Norway. Both parties, however, have invoked Washington law to govern Scanmar's counterclaims. The court will follow the parties' lead.

[2] To support its contention that it could sell directly to HPSEA customers, Scanmar points to a clause in the distribution agreement that states as follows: "[Scanmar] retains the right to market and sell by itself the Product in case of negligence or incapacity on part of [HPSEA], i.e. on the occasion of loss of key personnel and/or lack of promotional activities." Ramberg Decl. (Dkt. # 30), Dist. Agr. ¶ 1.2. Scanmar apparently interprets this clause to permit it to sell directly in an instance where HPSEA has not paid a debt owing under the agreement. The court need not resolve the issue, but it notes that Scanmar's argument is at odds with the plain language of the clause. Scanmar had the right to terminate the agreement if HPSEA defaulted on payments. *Id.* ¶ 3.2.2. Scanmar chose not to exercise that right, however, until December 27, 2007.

ORDER – 10

in the arbitration and in its opposition to HPDH's summary judgment motion, Scanmar argued vociferously that HPDH was not a party to the distribution agreement. HPDH no longer argues otherwise. That matters, because a tortious interference claim requires proof of an improper purpose or improper means. HPDH did not assist Scanmar in directly contacting customers because HPDH hoped to win a commission on those sales. Because HPDH had no contractual obligation to Scanmar, it was as free as any other third party to attempt to find customers who wanted Scanmar products and then approach Scanmar to request a commission. For the same reason, it was also free to take no action that would help Scanmar bypass it and deal with customers directly. Scanmar thus alleges neither an improper purpose nor improper means with respect to HPDH's alleged interference with the distribution agreement.

Even if the court were to accept that it was somehow improper for HPDH not to assist Scanmar in dealing directly with HPSEA customers, Scanmar could not overcome that there is no evidence that HPDH's conduct led to the termination of the distribution agreement. Scanmar undisputedly terminated the distribution agreement because of HPSEA's "lack of will and/or ability to settle outstanding debts." Congalton Decl. (Dkt. # 139), Ex. 10. HPDH did not induce that termination.

### 2. HPDH Did Not Interfere by Delaying the 13 Purchase Orders.

No evidence supports Scanmar's claim that HPDH's "delay" in processing the 13 purchase orders it ultimately forwarded to Scanmar amounted to tortious interference with a business expectancy. Instead, the evidence shows that Scanmar was aware of 4 of those purchase orders by late October 2007. Although it refused to honor those purchase orders on October 31, it did nothing at all thereafter, or at least nothing until December 17, to attempt to complete those orders directly with the customers. The court assumes that these first four purchase orders did not, on their face, disclose the customers to whom they pertained. The court further assumes that Scanmar had not learned through other channels who those customers were. Scanmar nonetheless was obligated to do *something*

ORDER – 11

to secure those direct sales.  Instead, it did not so much as request the names of the customers until at least December 17.  Scanmar chose, for reasons of its own, to content itself with merely telling HPSEA and HPDH that it would secure orders directly, without taking any steps to do so.  For example, when Scanmar wrote HPSEA on October 31, it stated that it would sell the equipment listed in the four purchase orders directly to the customers, but it did not suggest that there was any impediment to it completing those sales.  It claims that it did not receive the "full identification of ship names and other details until December 20, 2007," but it provides scarce evidence that this prevented it from making the sales.  The only evidence, in fact, is a bare declaration from Scanmar's Chairman stating that because it "was not timely provided the identification information . . . the necessary installation work could not be made in Seattle prior to the fleet leaving."  Skjold-Larson Decl. (Dkt. # 138) ¶ 7.  That squares poorly with the contemporaneous evidence, which shows that even as late as December 21, when Scanmar had vessel names corresponding to all of the purchase orders, Scanmar was content merely to restate its intent to "contact the end customers directly," without suggesting that it had ever made attempts to do so.  Congalton Decl. (Dkt. # 139), Ex. 8 (Dec. 21 email).

      As to purchase orders dated after the first four that Scanmar rejected in October, Scanmar also took no action.  Mr. Tilleman informed Scanmar no later than November 8 that he was trying to "get some orders together," and requested pricing information.  Scanmar did not protest.  It did not demand the names of customers so it could sell directly to them.  It did not tell HPDH to stop trying to "get some orders together" because it would not honor them.  Instead, it provided the pricing information that Mr. Tilleman requested.  And it did so again on November 30.  Without more evidence as to what effort, if any, Scanmar made prior to December 17 to complete the sales evidenced in the 13 purchase orders, no finder of fact could conclude that HPDH's delay in providing names caused harm to Scanmar.  HPDH is no more responsible for the delay

ORDER – 12

than Scanmar, and Scanmar's implicit insistence that HPDH should have done more amounts to a complaint that HPDH did not do Scanmar's job for it.

Once Scanmar requested customer names on December 17, HPSEA and HPDH provided the names within 3 days. There is no evidence that this 3-day delay caused Scanmar to lose business. Indeed, once Scanmar had the names, there is no evidence that it did anything to contact customers directly until December 28. All evidence points to the conclusion that it was Scanmar's delay in making any attempt to secure sales directly until December 17 (at the earliest) that was the cause of any inability to complete sales.

But the lack of evidence of harm attributable to HPDH rather than Scanmar is just one fatal flaw in Scanmar's tortious interference claim based on "delay" in processing the purchase orders. Even if HPSEA had an affirmative obligation to help process those orders absent a request from Scanmar, HPDH had no such obligation. Again, HPDH was not bound to Scanmar. HPDH was free to do nothing to assist Scanmar in contacting customers directly; that it did precisely that (at least until late December) is not evidence of the use of improper means. HPDH's desire to secure a commission on those sales is not an improper purpose. An improper purpose in the context of a tortious interference claim is the "improper objective of harming the plaintiff . . . ." *Pleas v. City of Seattle*, 774 P.2d 1158, 1163 (Wash. 1989). Scanmar urges the court to hold that when HPDH did not do Scanmar's job (*i.e.*, arranging for direct Scanmar-to-customer sales) it intended to harm Scanmar. By that logic, everyone who attempts to secure a sale on his own behalf has acted with an improper purpose toward every one of his competitors. The law does not permit that result.

### 3. HPDH Did Not Interfere by Asking Customers to Insist that It Serve as The Intermediary for Orders from Scanmar.

By December 28, Scanmar finally began taking steps to deal with customers directly. It sent a letter to at least one customer, and the court assumes for purposes of this order that it sent a similar letter to every customer who had attempted to make a

ORDER – 13

purchase through HPDH or HPSEA. When Mr. Tilleman found out about the letter, he wrote one of his own, asking those customers to insist that Scanmar use HPDH as the middleman for those sales.

Scanmar cannot prove tortious interference based on Mr. Tilleman's efforts. Mr. Tilleman and HPDH were as free as anyone else to compete with Scanmar for the right to complete those orders. Scanmar complains that Mr. Tilleman did not accurately describe the financial dispute that led Scanmar to terminate the distribution agreement with HPSEA. But that makes no difference, because there is no evidence that customers cared why Scanmar and HPSEA were no longer doing business. Instead, the evidence shows that some customers cared about having a business in Alaska that could supply and service Scanmar products. Mr. Tilleman merely attempted to promote HPDH as that local business. As the court has already discussed, it had no improper purpose as a matter of law, and used no improper means in its efforts to secure those sales.

### B.     Implied Covenant of Good Faith and Fair Dealing

In Washington, "[t]here is in every contract an implied duty of good faith and fair dealing." *Badgett v. Security State Bank*, 807 P.2d 356, 360 (Wash. 1991). Scanmar's claim for breach of that duty goes no further that than simple sentence, because it had no contract with HPDH. HPDH strove mightily to enter a contract with Scanmar, but Scanmar refused.

Unable to point to a contract, Scanmar points to its "supply relationship" with HPDH, a relationship that this court has previously acknowledged. That relationship consisted, as the court has noted, of Scanmar accepting HPDH purchase orders prior to Scanmar adopting its hardline stance in late 2007 with respect to the Hydra-Pro entities. Unlike Scanmar's "supply relationship" with HPSEA, which was governed by the distribution agreement, no contract governed Scanmar's relationship with HPDH. Instead, that relationship consisted of a series of contracts. That series ended in late 2007, when Scanmar refused to enter contracts with HPDH. Scanmar cannot, as a matter

ORDER – 14

of law, claim a breach of a duty implied in contracts that it never entered.  *See Keystone Land & Development v. Xerox Corp.*, 94 P.3d 945, 949 (Wash. 2004) ("[W]e have consistently held there is no 'free-floating' duty of good faith and fair dealing that is unattached to an existing contract.") (quoting *Badgett*, 807 P.2d at 360).

## IV.  CONCLUSION

For the reasons stated above, the court GRANTS HPDH's motion for summary judgment (Dkt. # 140) and DENIES Scanmar's motion for partial summary judgment (Dkt. # 137).  The clerk shall enter judgment for HPDH on Scanmar's two counterclaims.  Because those counterclaims are the sole claims remaining, the clerk shall TERMINATE this civil action.

Dated this 15th day of April, 2014.

*Richard A. Jones*

The Honorable Richard A. Jones
United States District Court Judge

ORDER – 15